**AFFIRM; Opinion issued March 28, 2013**



In The

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-12-00421-CR**

_____

**TIMOTHY BOX, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 422nd Judicial District Court**
**Kaufman County, Texas**
**Trial Court Cause No. 29114-422**

# MEMORANDUM OPINION

Before Justices Bridges, O'Neill, and Murphy
Opinion By Justice Bridges

Appellant Timothy Box appeals his conviction for burglary of a habitation and his accompanying sentence of 99 years' imprisonment. In four issues, appellant contends: (1) the trial court's punishment was outside the applicable range; (2) he received ineffective assistance of counsel; (3) the trial cour erred in allowing evidence of extraneous offenses; and (4) the evidence is insufficient to support his conviction. We affirm.

### BACKGROUND

*1.    Benton Burglary*

Appellant was indicted with committing burglary of a habitation owned by Bobby Benton on or about August 3, 2010. Benton testified he and his wife lived at a residence in Quinlan,

Kaufman County. The morning of August 3, 2010, he had left his residence at about 8:35 a.m. and returned at approximately 3:13 p.m. When he walked into his home, everything appeared as usual at first until he noticed his DVD player was hanging off the television stand. At that point, he went to other rooms and realized "the place had been ransacked." His drum set that he used for work had been stolen along with his wife's jewelry boxes. Everything in the master bedroom had been turned over.

Benton testified he had secured his home when he left that morning, but noticed the back door was open that afternoon when he returned. After Officer Chad Hill with the Kaufman County Sheriff's Department arrived, Benton and Hill discovered the entire master bathroom window had been removed, and the burglars had taken the window with them. Benton valued the items taken at close to $6,000, including the damage to his property. He did not know appellant and did not give anyone, including appellant or Tyna Poynter,[1] permission to enter his house or to take his possessions.

Benton said he saw Hill attempt to preserve fingerprints at the scene. Benton later gave a list of stolen items, which he and his wife compiled, to Sergeant Woodall with the Kaufman County Sheriff's Department. Benton said he went up and down the street to let his neighbors know he had been burglarized, and he found out several other homes in the area had been burglarized.

On re-direct examination, Benton said Woodall later contacted him about some of the items that had been recovered. Benton said he personally recovered some of the items himself, one of which was located at the American Pawn shop. Benton explained he had not recovered all of the items, but that he had tags from the pawn shop with some names on them, including a couple

---

[1] At the time of the offense, Tyna Poynter was appellant's girlfriend. At the time of trial, she was his wife.

–2–

of tags with "Tyna Poynter" on them.

Hill testified he responded to a burglary call at the Benton residence. He met with Benton, cleared the house, and walked through and looked at each room with Benton. Hill took photos and dusted for fingerprints, but was unable to lift any usable prints.

Woodall testified he had been assigned to investigate the August 3, 2010 burglary of the Benton residence. Woodall received information, via email from Investigator Peters, who was working several burglary investigations in Hunt County. A person of interest was named in the email, along with four other persons. At that point, Woodall went through a pawn shop database known as "Leads on Line."[2] Appellant's name was one of the names received from Investigator Peters. Woodall discovered some items had been pawned by appellant. When he went to the pawn shop, Woodall received identifying information, including a driver's license number, on the person named "Timothy Box" that had pawned the items. The driver's license number matched that of appellant.

Woodall then contacted Peters, who indicated he was at a Dove Drive[3] address in Hunt County due to his investigation into a similar offense. Woodall described the property that was missing and, during their search, Peters stated some of the described items were located there. On August 23, 2010, Woodall met Peters at the residence on Dove Drive. Woodall discovered Tyna Poynter resided at the address, and Poynter gave consent to search. Poynter said she lived in the fifth-wheel trailer with appellant. Woodall spoke with Poynter about possibly stolen items, including Benton's musical equipment. Poynter instructed Woodall a drum set was in the shed

---

[2] Woodall testified Leads on Line provides a database that includes 90 percent of the pawn shops in the United States, which allows officers to run suspects' names, addresses, serial numbers on property, and property descriptions in an attempt to locate stolen property.

[3] Throughout the trial, witnesses referred to appellant and Poynter's residence as both "Dove Lane" and "Dove Drive." For simplicity, we refer to the residence only as "Dove Drive."

behind the trailer.   Benton's drum set was inside the shed.

Woodall then ran Poynter's name on Leads on Line and determined she had pawned several items of jewelry coming from the Benton residence.   Woodall recovered some of the Benton's jewelry from pawnshops, along with a 20-inch cymbal, a tambourine, and a cymbal stand from a pawn shop.   The musical equipment had been pawned by appellant.   Benton identified those items as items taken from his home.

On cross-examination, Woodall clarified the shed was unlocked.   No fingerprints were taken from the stolen property.   Woodall said he did not know who placed the drum equipment in the shed, but Poynter said she did not.   Defense counsel asked Woodall if appellant's name had arisen in conjunction with some burglaries in Hunt County, and Woodall agreed.   The following exchange then took place:

> Q. It's true that he was never filed on in any of those cases, they've been dismissed against him, you understand that?
>
> A. I didn't follow-up with those cases.
>
> Q. You have no reason to believe it was ever technically charged with and gone to trial?
>
> A. I knew Detective Peters had some dealings with [appellant] involving some offense, but I wasn't sure how they went.

Woodall then testified that none of Benton's stolen property was located inside the fifth-wheel trailer.   Rather, Benton's property was located inside the unlocked shed on the property. Woodall said Poynter told him she did not know who put the equipment in the shed.   Woodall also agreed that the person who burglarizes a residence is not always the one who takes it to the pawn shop and, sometimes, people don't know they are taking stolen property to a pawn shop.

On re-direct, the State offered Exhibit 4 (a print-out from Leads on Line, which shows

–4–

appellant pawned a "CYMBAL ZILDJIAN M/AVEDIS S/NV 16' 20" AND 12' EACH W/STAND" for $100) without objection.[4]   Woodall explained he recognized these items as being "similar and like items to Mr. Benton's" and that the identifying information (name and date-of-birth) listed on Exhibit 4 matches appellant's identifying information.   Woodall confirmed the items pawned by appellant were identified by Benton as among the items taken from his home.

Following Woodall's testimony, the trial court conducted a hearing outside the presence of the jury to determine whether defense counsel had opened the door to the admission of extraneous offense evidence.   The State argued:

> [I]n questioning Sergeant Woodall, [defense counsel] mentioned some cases in Hunt County; and he asked Sergeant Woodall if those cases had in fact been dismissed.   At this point in time I would like to offer those cases in as extraneous offenses.   I believe [defense counsel] opened the door to it, and under 404(b) I think they would come in.   The question of identity has been raised, and those other offenses are permissible to show the identity of the defendant as the one that committed this burglary.
> ...
> We think the Hunt County [cases] opens the door to the Dallas County similar case.

The trial court agreed defense counsel opened the door when asking about the dismissal of the Hunt County cases and permitted the admission of extraneous offense evidence for the purposes of showing identity.[5]

Poynter testified she married appellant about a year prior to trial and previously lived at the residence on Dove Drive.   Poynter explained a fifth-wheel trailer, a travel trailer, and a storage shed were on the lot. In August of 2010, Joe Grubbs and Mikie Brown lived there, too.   She also

---

[4]   Defense counsel initially objected to States Exhibit 4 as hearsay, but then had no objection when it was re-offered after the State had asked additional questions of Woodall.   Appellant raises these facts in connection with his ineffective assistance of counsel claim.

[5]   For clarity purposes, we have placed the testimony regarding the other offenses in the next section of our opinion.

said appellant lived there 30 to 40 percent of the time. Grubbs and Brown lived in the small RV on the property. Because the RV did not have facilities, Grubbs and Brown would use the restroom and take a shower in the fifth-wheel trailer. Poynter said they had "open access" to the fifth-wheel. Appellant, on the other hand, stayed in the fifth-wheel trailer with Poynter or at his cousin's place in Carrollton.

In the middle of August, she recalled seeing some drum equipment in the back shed. She presumed, because it was not hers, it must belong to Grubbs. She also said some of appellant's drums were in the shed. Poynter said, at one point, Grubbs gave her the drum equipment to pawn so she could pay her bills. She said she gave appellant the equipment to pawn. Subsequently, she learned the equipment was actually from a burglary of the Benton residence but did not know it at the time she asked appellant to pawn the equipment. Poynter admitted she was arrested for the burglary and pleaded guilty even though she denied committing the burglary.

She said she gave Woodall permission to search but did not know there were stolen items on her property. Prior to Woodall's arrival, she had stepped outside to do laundry. Besides herself, she stated appellant and Shane Wallace were at her fifth-wheel trailer. When she returned from the laundry, Grubbs and Erin Carter were also there. Appellant, Wallace, Grubbs, and Carter were arrested that day. Poynter was arrested the next day.

She said she received the stolen items from Grubbs to pawn, but she did not know they were stolen at the time she pawned the items. She testified someone could have put items inside her shed without her knowing about it, because she left the shed unlocked. There was also no lock on the RV. Prior to Grubbs giving her the items, she said she had not seen the items before. She had never been to Benton's residence. She had seen Grubbs place items in the storage shed on her property, and explained the shed contained items that belonged to her, appellant, and Grubbs.

When asked by defense counsel, she said she did not know who Chapin[6] was at the time. She explained Trinity was a truck-driver friend who would check on her.

On cross-examination, Poynter admitted she signed a stipulation that she broke into Benton's residence and took property from him. She never asked Grubbs where the items came from that she pawned. She explained there was never a time when appellant was at the residence on Dove Drive that she was not also there.

Trinity Thompson testified he was a friend of Poynter. In August of 2010, he would go to Poynter's residence on Dove Drive to check on her. When shown the picture of the shed with the drum equipment inside, Thompson said he recognized the drums because he saw "the boys" unload them. Thompson indicated Grubbs and Brown unloaded the drums, along with some stereo equipment, a shotgun, and a few other things, into the shed. Brown tried to sell the items to Thompson. He said appellant was not there that day. Thompson saw the items being unloaded into the shed prior to Poynter's arrest.

## 2. *Extraneous Offenses*

### a. *Hunt County Burglaries*

Following the trial court's decision to allow evidence of appellant's extraneous offenses, Deputy David Wilson of the Hunt County Sheriff's Department testified he was assigned to patrol on August 19, 2010. He met Steve Stennett in the Easy Living subdivision in front of Finstead's store. At that time, Stennett indicated he had information regarding where some of his property might be located and that Christopher Chapin was a possible suspect. Stennett accompanied Wilson and another deputy to what was believed to be Chapin's residence and came into contact with Lindsey Sherrod, who said she lived there and gave consent to search. At that residence, the

---

[6] The name "Chapin" was written inside a hat of one of the burglary suspects found in the woods behind the Stennett residence. The Stennett burglary is discussed more fully below.

officers found a compound bow and saddle bags that had been taken from Stennett. While looking around the property, a neighbor, Tina Sherrod, advised the officers that they might find the motorcycle[7] at an address on Dove Drive, which was about one mile away.

Wilson described the residence on Dove Drive as a fifth-wheel trailer, another RV opposite of the fifth-wheel trailer, and a shed in between the two. While there, he encountered Poynter, who said she lived there with appellant. After Poynter consented to search, Wilson located the black jacket that belonged to Stennett. Wilson then asked to talk to appellant. When he was speaking to appellant, Wilson saw rifles inside the fifth-wheel trailer and believed they were stolen property. Wilson confirmed a .22 rifle was stolen from Stennett's house. After finding the rifles, Wilson asked all of the occupants to exit the trailer for officer safety since he was alone at the time with one other deputy out on the street. Poynter then advised Wilson there was a shotgun inside the residence and, after back-up arrived, Wilson retrieved a shotgun from underneath a mattress where appellant had been lying when Wilson first entered the residence.

Wilson then contacted Peters who worked in stolen property. Peters arrived at the scene, and the officers located more stolen property. Along with the items stolen from Stennett, he also saw a drum set in the shed. Fingerprints were not taken from the items located.

Besides appellant and Poynter, Joseph Grubbs, Howard Wallace, and Carter were also inside the fifth-wheel trailer. Wilson explained that appellant, Grubbs, and Wallace were arrested at that time because they were the individuals within reach of the rifle that had been confirmed stolen.

Steve Stennett testified his home in Quinlan had been burglarized on August 19, 2010. When he returned home that day, the door to his garage was open, his dog had been injured, and his

---

[7] Stennett testified his motorcycle was located about a week later in another addition near his home.

house had been "trashed out." Stennett testified a 2007 Harley Davidson, guns, a knife collection and "just a little bit of everything" were taken from his home. He provided the police with a complete list of serial numbers, VIN numbers on all the guns, and pictures of some of the items. He said he did not know appellant and did not give appellant permission to take property from his home. Later, Stennett "tracked them through the woods," finding where they came in with different pieces of their belongings through the woods, including a cap with a name[8] in it. Stennett said he paid a local "snitch" to find out the location of the person named in the cap and then called the Hunt County sheriff's department again. He accompanied officers from the sheriff's department to look for the items. The saddle bags from his motorcycle were recovered from the Chapin residence.

When Stennett asked the officers about his riding jacket, the officers took him to a fifth-wheel trailer on Dove Drive, where his riding jacket, two helmets, and several of his weapons were recovered. Stennett testified four men and one woman came out of the residence.

Investigator Kenneth Peters of the Hunt County Sheriff's Department testified that he was contacted by Wilson regarding the burglary of Stennett's residence. Peters met Wilson at the fifth-wheel trailer on Dove Drive. When Peters arrived, Wilson already had appellant and others detained. Peters explained that property was everywhere, and Stennett was able to identify the property that had been taken from his home.

Peters testified Poynter said appellant lived there with her. Poynter gave consent to search. During the search, Peters found Carter hiding beneath a kitchen table. There was a warrant for her arrest, so she was arrested at that time. Peters indicated, "it was evident that those three individuals [appellant, Grubbs, and Poynter], if not more, were residing in this. . . little travel

---

[8] Stennett could not recall if the name inside the cap was "Chapin" or "Chapman."

trailer and had an abandoned mobile home next door to it." While appellant and Poynter appeared to live in the fifth-wheel trailer, Grubbs lived in the dilapidated RV on the property. Peters testified there were "lots of firearms, lots of sawed off shotguns. It was just everywhere you looked there was something different." Peters soon contacted Woodall, because Woodall was interested in a set of drums.

Peters explained that "a lot of the property that I recovered was taken from other offenses besides Mr. Stennett's." Specifically, Peters mentioned Jimmy Baker had some property (appliances and wood flooring) taken from his residence that was found behind a camping trailer at the same location on Dove Drive. Peters stated Poynter was also later arrested on the Stennett burglary.

### b. Dallas Burglary

Yolanda Najera testified she lived with her husband on Freeport Drive in Dallas. On November 7, 2011, she came home from work and saw a white van in her driveway. She called her husband to make sure no one was supposed to be at their home, which he confirmed. Yolanda called 911 and backed out of her driveway and into the alley. When she was in the alley, she could see through the cracks of her fence that the sliding door to her home was open and there was a container on the patio area. Then, she saw a man walking out of her house with more items. She identified appellant as the man who was inside her house that day. Yolanda's husband arrived and blocked the van, while she pulled around to the front of the house and met the police. She said appellant did not have permission to be in their home and did not have permission to take their property. Her jewelry box, clothing, a stereo, and speakers were inside the containers. She explained all of their property had been recovered.

David Najera also testified he lived at Freeport drive with his wife, Yolanda. After his wife

called, he immediately came home and saw the person that was breaking into their home. David identified appellant as the person inside his home that day. When David saw appellant walking down the alleyway, he asked appellant what he was doing there. Appellant responded he was there visiting a neighbor. David asked which neighbor, because he knew everyone in the neighborhood. At that point a police car was approaching, and appellant started running. David did not give appellant permission to enter their home or take their property. Although Yolanda told him there were two people inside the house, David only saw appellant. The police captured appellant and, inside his jacket, they later located two rings and cologne that belonged to the Najeras.

Officer Ashleigh Carillo of the Dallas Police Department testified she received a call about a burglary to a habitation on November 7, 2011. When Carillo arrived at the home, she saw Yolanda, who said someone was inside her home, an unknown van was in her driveway, and people were stacking her belongings against the fence in her back yard. Carillo and her partner then drove into the alleyway and saw appellant and David Najera. Carillo identified appellant as the person David identified as the one who had been inside his home.

**ANALYSIS**

*1.* *Range of Punishment*

In his first issue, appellant complains the trial court's punishment was outside the applicable range of punishment, thereby violating his right to due process. We review the punishment imposed by the trial court for an abuse of discretion. *Jackson v. State,* 680 S.W.2d 809, 814 (Tex. Crim. App.1984). Generally, a sentence that is within the statutory range of punishment established by the Legislature will not be disturbed on appeal. *See id.*

Appellant was convicted of burglary of a habitation, a second degree felony. TEX. PENAL CODE ANN. § 30.02(c)(2) (West 2011). Prior to trial, the State filed its notice of intent to seek enhancement of the range of punishment and listed five prior felony convictions.[9] The State's notice concluded: "That should the jury find from the evidence and say so by their verdict that the Defendant is the same person previously convicted of at least two of the offenses set forth in Paragraph I, Paragraph II, Paragraph III and/or Paragraph IV above, the range of punishment for each offense listed in the indictment would be imprisonment. . . for life or a term of no more than ninety-nine (99) years but not less than twenty-five (25) years." Appellant elected for the trial court to assess punishment, and pleaded true to enhancement paragraphs I, II, III, IV, and V. The pleas of true were accepted by the trial court, and the trial court assessed punishment at 99 years' imprisonment.

Appellant argues that, in order to enhance punishment pursuant to section 12.42(d) of the penal code, the State must "specify which of the five priors listed will be used as the first or second conviction−so as to see if it meets [section] 12.42 requirements" and that alleging the five priors alone "is not sufficient." Furthermore, appellant argues the trial court failed to specify if the evidence met the burden as set out in "the requirements of 12.42(d): In other words, the [Trial] Court did not make the finding that the offense date of any of the previous convictions occurred after another previous conviction had become final." Appellant argues that, by not doing so, the range of punishment should be limited to that of a second degree felony. We disagree.

Section 12.42(d) provides, in pertinent part, if it is shown that the defendant "has previously been finally convicted of two felony offenses, and the second previous felony conviction is for an offense that occurred subsequent to the first previous conviction having

---

[9] The felony offenses included: (1) aggravated robbery, (2) burglary of a habitation, (3) possession of a controlled substance, (4) kidnapping, and (5) criminal mischief.

become final, on conviction the defendant shall be punished by imprisonment . . . for life, or for any term of not more than 99 years or less than 25 years." To the extent the indictment does not contain specific allegations regarding the sequence of appellant's prior felony convictions, specificity is not required. *See Jingles v. State*, 752 S.W.2d 126, 129 (Tex. App.–Houston [14th Dist.] 1987, pet ref'd) (concluding section 12.42(d) does not require the State to allege sequentiality in the indictment); *Fitzgerald v. State*, 722 S.W.2d 817, 822 (Tex. App.–Tyler 1987) (indictment without allegations of sequentiality not defective), *aff'd*, 782 S.W.2d 876 (Tex. Crim. App. 1990).

Here, the State's notice of its intent to seek enhancement of the punishment range states the felony convictions were obtained in 1986, 1987, 1991, 1993, and 1994, respectively. The defendant made a plea of true to these enhancement paragraphs. Generally, a defendant's true plea to an enhancement paragraph relieves the State of its burden to prove habitual offender status, and the defendant waives any complaint that the evidence is insufficient to support it. *See Harvey v. State*, 611 S.W.2d 108, 111 (Tex. Crim. App. 1981); *Cruz v. State*, No. 01-00-00463-CR, 2001 WL 1168273, *1 (Tex. App.–Houston [1st Dist.] Oct. 4, 2001, no pet.) (not designated for publication).

The State also offered Exhibits 8, 9, 10, 11, and 12 as evidence of appellant's prior convictions.[10] The trial court admitted the exhibits without objection, and appellant stipulated that he was the person named and convicted in the prior felony cases. Thus, the record here affirmatively shows the prior convictions met section 12.42(d)'s requirements. *See Cruz*, 2001 WL 1168273 at *1. We, therefore, conclude the evidence before the court was sufficient to

---

[10] Exhibits 8-12 provide evidence of appellant's prior felony convictions of burglary of a habitation (1987), aggravated robbery (1986), kidnapping (1993), criminal mischief (1994), and possession of a controlled substance (1991), and also his prior misdemeanor convictions of tampering with a government record (2005) and failure to identify (2005).

invoke the enhancement permitted under section 12.42(d), and the trial court did not abuse its discretion.  *See id.; Jackson*, 680 S.W.2d at 814.   We overrule appellant's first issue.

**2.      *Extraneous Offenses***

In his third issue, appellant complains the trial court erred in allowing the jury to hear evidence of extraneous offenses.   Specifically, appellant complains of the testimonial evidence regarding the Stennett, Baker, and Najera burglaries.

Rule 404(b) prohibits the admission of extraneous offense evidence to prove an individual's character in order to show action in conformity with that character.   TEX. R. EVID. 404(b).   This limitation is not based on legal relevance; rather, the evidence is inherently prejudicial, has a tendency to confuse the issues, and forces the accused to defend himself against uncharged crimes in addition to the charged offense.   *Daggett v. State*, 187 S.W.3d 444, 451 (Tex. Crim. App. 2005); *Albrecht v. State*, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972).   However, extraneous offense evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b). These exceptions are not exclusive, and the proponent of misconduct evidence need not "stuff" a given set of facts into one of the laundry-list exceptions set out in Rule 404(b) for admission to be proper; he must, however, explain the logical and legal rationalities that support admission.   *See De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). Rebuttal of a defensive theory is also a permissible purpose under 404(b).   *See Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *Albrecht*, 486 S.W.2d at 101.

A trial court's ruling on the admissibility of extraneous offenses is reviewed under an abuse-of-discretion standard.   *De La Paz*, 279 S.W.3d at 343.   As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion, and the trial court's

ruling will be upheld. *Id.* at 344. A trial court's ruling is generally within this zone if the evidence shows that (1) an extraneous transaction is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury. *Id.* Furthermore, if the trial court's evidentiary ruling is correct on any theory of law applicable to that ruling, it will not be disturbed even if the trial court gave the wrong reason for his right ruling. *Id.* As already noted, during the course of cross-examination, defense counsel asked Woodall if appellant's name had arisen in conjunction with some burglaries in Hunt County, and Woodall agreed. The following exchange then took place:

> Q. It's true that he was never filed on in any of those cases, they've been dismissed against him, you understand that?
>
> A. I didn't follow-up with those cases.
>
> Q. You have no reason to believe it was ever technically charged with and gone to trial?
>
> A. I knew Detective Peters had some dealings with [appellant] involving some offense, but I wasn't sure how they went.

Outside the presence of the jury, the State then argued:

> I would like to offer those cases in as extraneous offenses. I believe [defense counsel] opened the door to it, and under 404(b) I think they would come in. The question of identity has been raised, and those other offenses are permissible to show the identity of the defendant as the one that committed this burglary.
> ...
> We think the Hunt County [cases] opens the door to the Dallas County similar case.

The trial court agreed defense counsel had opened the door when asking about the dismissal of the Hunt County cases and permitted the admission of extraneous offense evidence for the purposes of showing identity.

−15−

To be admissible to show identity, an extraneous offense must be so similar to the offense-at-issue that the offenses are marked as the accused's handiwork. *Lane v. State*, 933 S.W.2d 504, 519 (Tex. Crim. App. 1996). Sufficient similarity may be shown by proximity in time and place or by a common mode of committing the offenses. *Dickson*, 246 S.W.3d at 742 (citing *Ransom v. State,* 503 S.W.2d 810, 813 (Tex. Crim. App. 1974)).

The record before us demonstrates the Hunt County burglaries (Stennett and Baker) and the Benton burglary were committed in close proximity to appellant's home and the burglaries were similar. As already noted, the Benton burglary occurred on August 3, 2010. The Stennett burglary took place on August 19, 2010. The Stennett and Benton burglaries were both daytime residential burglaries by forced entry in which the homes were ransacked. The Baker burglary was also a residential burglary. [11] The property stolen at the Benton, Stennett, and Baker burglaries were commingled at the Dove Drive residence where appellant and Poynter lived. The Najera burglary, although committed in Dallas, also was a residential burglary committed during daytime hours by appellant with forced entry.

In addition, we note appellant's defensive theory at trial was that he and Poynter pawned some of the stolen items from the Benton burglary but were unaware the property was stolen. In light of the similarities between the offenses, "it is at least subject to reasonable disagreement whether the extraneous-offense evidence was admissible for the noncharacter-conformity purpose of rebutting appellant's defensive theory" that appellant was unaware the items were stolen. *De La Paz*, 279 S.W.3d at 346-47.

Furthermore, we conclude the extraneous offenses were admissible pursuant to the doctrine of chances. *See id.* at 347. "The 'doctrine of chances' tells us that highly unusual events

---

[11] The record does not reflect at what time of day the Baker burglary took place or whether the entry was forced.

are unlikely to repeat themselves inadvertently or by happenstance." *Id.* Although the jury might reasonably presume that one of the other residents at the Dove Drive residence left an item(s) of stolen property without appellant's knowledge, it is far less likely the proceeds of multiple burglaries would be in all the buildings on the property and appellant would have pawned the items without any indication they were stolen. It is also far less likely appellant was innocent of the knowledge the items were stolen when he was later arrested for leaving the Najera burglary with stolen property in his pockets.

In light of the record before us, we conclude the trial court did not abuse its discretion in allowing the extraneous offense evidence. *See id.* at 344; *see also Dickson*, 246 S.W.3d at 743 (noting that "[w]here a pattern of offenses are so similar that the offenses are marked as the handiwork of the accused and identity is at issue, then extraneous offense evidence may be admitted to prove identity"). We overrule appellant's third issue.

### 3.      *Sufficiency of the Evidence*

In his fourth issue, appellant challenges the sufficiency of the evidence to support his conviction. In particular, appellant argues that "pawning one item of stolen property is not sufficient to support a conviction for burglary."

In reviewing a challenge to the sufficiency of the evidence, we examine all the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex. Crim. App. 2010) (plurality op.). We are required to defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326 ("a court faced with a record of historical facts that supports conflicting

inferences must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution").

In order to obtain a conviction, the State was required to prove beyond a reasonable doubt that appellant, without the effective consent of the owner, entered a habitation with intent to commit a felony, theft, or an assault. TEX. PENAL CODE ANN. § 30.02 (West 2011). The jury was charged, in part, as follows:

> Now bearing in mind the foregoing instructions, if you believe from the evidence beyond a reasonable doubt that on or about August 3, 2010 in Kaufman County, Texas the defendant, Timothy Box, *either acting alone or as a party*, by soliciting, encouraging, directing, aiding or attempting to aid another, did then and there intentionally or knowingly enter a habitation, with the effective consent of Bobby Benton, then you will find the defendant guilty as charged in the indictment Cause Number 29114-422.

(Emphasis added).

A defendant's unexplained possession of property recently stolen in a burglary permits an inference that the defendant is the one who committed the burglary. *Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007). The inference permitted is that the defendant is criminally responsible, at least as a party, for all property stolen during the burglary. *Id.* at 726. A person may be convicted as a party to an offense if that person commits the offense by his or her own conduct or by the conduct of another for whom he or she is criminally responsible. TEX. PENAL CODE ANN. § 7.02 (West 2011).

Here, appellant argues the evidence that he pawned Benton's stolen drum equipment is insufficient to support his conviction for burglary of a habitation. However, that is not the only

evidence before us. In August of 2010, appellant and Poynter were living inside the fifth-wheel trailer on Dove Drive. Multiple pieces of stolen property from the Benton burglary, along with at least two other Hunt County burglaries, were found at their residence on Dove Drive. The stolen property was scattered throughout the property (in the fifth-wheel trailer, the shed, and the RV), reducing the likelihood appellant was unaware of the items at his residence. Appellant pawned some of Benton's stolen drum equipment. While on bond for the burglary of the Benton residence, appellant was caught burglarizing a home in Dallas under similar circumstances. Poynter admitted she was aware of the drum equipment in the back shed. Poynter explained she gave appellant some of the drum equipment without asking where it came from because she needed money to pay bills. The jury was able to ascertain the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326. Furthermore, based on the evidence before it, the jury reasonably could have inferred that appellant was actively involved in the "business" of burglary, including the Benton burglary, whether he was physically present at Benton's residence or not. See *Rollerson*, 227 S.W.3d at 725-26. We overrule appellant's fourth issue.

### 4.      *Ineffective Assistance of Counsel*

In his second issue, appellant complains his trial counsel was ineffective for failing to object to: (1) a portion of the charge wherein the trial court commented on the weight of the evidence in the charge by mentioning or referring to the duties and responsibilities of a pawnbroker; (2) the testimony concerning the appellant as a suspect in numerous other burglaries; and (3) State's Exhibit 4, a list of items purportedly pawned by appellant.

A claim of ineffective assistance of counsel is reviewed under the *Strickland* test. *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). In determining whether counsel rendered ineffective

–19–

assistance, an appellate court considers two factors: (1) whether counsel's performance fell below an objective standard of reasonableness and (2) whether, but for counsel's deficient performance, the result of the proceeding would have been different. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex Crim. App. 1999). Appellant bears the burden of proving his counsel was ineffective by a preponderance of the evidence. *Id*. at 813.

There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 813. To defeat this presumption, appellant must prove that there was no plausible professional reason for a specific act or omission. *Bone*, 77 S.W.3d at 836. Any allegations of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. Thus, a reviewing court will rarely be able to fairly evaluate the merits of an ineffective assistance claim on direct appeal because the record on direct appeal is not developed adequately to reflect the reasons for defense counsel's actions at trial. *Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007).

Here, we do not have an adequate record to review appellant's claim of ineffectiveness. *See id.*; *Thompson*, 9 S.W.3d at 813-15. Appellant must prove that there is no possible strategic reason for counsel's actions and trial counsel should be given the opportunity to explain his actions before being denounced as "ineffective." *Bone*, 77 S.W.3d at 836. The record before us is devoid of evidence from trial counsel himself and is "simply undeveloped and cannot adequately reflect the failings of trial counsel." *Thompson*, 9 S.W.3d at 814 (citing *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998)).

The record is silent as to why appellant's trial counsel did not object to: (1) a portion of the

charge wherein the trial court commented on the weight of the evidence in the charge by mentioning or referring to the duties and responsibilities of a pawnbroker; (2) the testimony concerning the appellant as a suspect in numerous other burglaries; and (3) State's Exhibit 4, a list of items purportedly pawned by appellant. Therefore, appellant has failed to rebut the presumption that counsel's decisions were reasonable, and we overrule appellant's second issue. *Bone*, 77 S.W.3d at 833; *Thompson*, 9 S.W.3d at 813-14.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the judgment of the trial court.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
120421F.U05

−21−



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TIMOTHY BOX, Appellant

No. 05-12-00421-CR      V.

THE STATE OF TEXAS, Appellee

Appeal from the 422nd Judicial District Court of Kaufman County, Texas. (Tr.Ct.No. 29114-422).
Opinion delivered by Justice Bridges, Justices O'Neill and Murphy.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered March 28, 2013.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE